## *In re* COOP's WILL.

### (*Surrogate's Court, New York County.* June 22, 1889.)

WILLS—TESTAMENTARY CAPACITY—EVIDENCE.

In 1884 decedent made a will, signed by herself, by which contestant was given a legacy. In 1887 she gave instructions to an attorney to draw another, which excluded him from any benefaction; but she refused to sign it, and it was lost. In 1889 another will was drawn on the basis of the will of 1884, and modified according to instructions given in 1887, and in which no provision was made for contestant. On the day on which decedent executed this last will the attorney testified that she was very sick with a heavy cough; that he read and explained the will to her; that he wrote her name thereto, she making her mark by holding the pen; that he and another witness suggested by her signed as attesting witnesses. The testimony failed to show what conversation took place with decedent about the will, or that she declared the paper to be her will, or that she requested the attesting witnesses to sign it as such, or that she was questioned thereto. The attending physician testified that he saw decedent the same day, shortly after the execution of the will; that she did not recognize him; that she spoke to no one unless aroused, and showed no interest in anything around her, and was physically weak. Other

witnesses stated that on the same day she was in a dazed, stupefied condition, and apparently asleep or unconscious, and that during that day her mind was wandering. She died four days after the will was executed. *Held*, that decedent did not have testamentary capacity.

On petition for probate of the will of Rebecca M. Coop.

*Barnum & Rebhann*, for proponent. *Thomas J. Farrell*, for contestant.

RANSOM, S.   The question to be determined in this proceeding is whether the decedent at the time of the execution of the paper offered as her will was in all respects competent to make a will, and not under restraint. Objections were filed by the special guardian of Frank Dionysius, a minor grandchild of decedent, who is one of the next of kin, and also a legatee under a will executed in 1884, (also propounded for probate since the beginning of this proceeding,) alleging that the paper was not properly executed; that it was not the decedent's free, unrestrained, and voluntary act, but was the result of undue influence; and that she was not, at the time of its execution, of sound mind.

According to the testimony of Mr. Rebhann, the attorney who drafted the paper, it was executed between 4 and 5 o'clock in the afternoon of Wednesday, February 13, 1889. On Saturday, the 9th, Mrs. Schaeper, one of the residuary legatees, called at his office, and stated that the decedent wanted to see him in regard to her will, and wanted him to go up personally. He told Mrs. Schaeper that he could not go then, but wrote the decedent that he would call on Wednesday following.

The origin of the will, as testified by Mr. Rebhann, was as follows: Two years previously he had received instructions from the decedent to draw her will. He did so, and sent the paper to her residence by his clerk and another party, to have it executed; but the clerk returned with the paper, and reported to him that decedent had refused to execute it because he (Rebhann) was not present. What became of the paper he does not know, but it contained the same provisions as the one now under consideration. After the return of that paper he did not personally go to the decedent, because he thought that she was able to come to him, and he did not see her from that time until February 13, 1889, when the present will was signed. It was drawn on the 11th, two days after Mrs. Schaeper called, he using a will executed in 1884 as the basis, and modifying it to conform to the instructions he had received for the will of 1887. When he reached decedent's house on the afternoon of the 13th he found her in the parlor or sitting-room, seated on a sofa. He told the servant that he wanted the room to himself, and a boy who had come in and saluted the decedent was excluded. He then "talked with her about the will," and said, "I have got with me now just what you want, and you can sign it," and he read and explained each article of the instrument to her. He told her it would be necessary to have another witness, and he asked the servant if she could get somebody, and the decedent said, "Get Mr. Seedorf;" that Seedorf then came up with pen and ink. He said to Seedorf that the decedent was about to make her will, and as it was necessary to have two witnesses she had requested that he (Rebhann) sign with him as the other witness. He wrote the name "Rebecca Margaret Coop" in Seedorf's presence, and made the mark, a cross, at the foot of it, with decedent's finger and thumb on the top of the pen, and then wrote the words, "her mark." He further states that the decedent put her finger on the seal. Mr. Rebhann says that he arrived at the house at three minutes past 4, and was there about half an hour. When the matter was closed he left, taking the will with him, and he held it until it was offered for probate. He never saw the decedent afterwards. As to her physical condition, he states that she was very sick with a heavy cough, but was not very weak, as she was sitting up on the sofa, and was able to call for a glass, and asked for an orange, which she sucked, and put it back into the glass again. There is nothing in the testimony of Mr.

Rebhann to show what conversation the decedent had with him about the will, or that in words she declared the paper to be her will, or that he asked her if it was her will, and that she gave an affirmative answer.   Nor does he testify that she in words requested him and Seedorf to sign it as witnesses, or that she was questioned in respect thereto, and that she gave an affirmative answer.   If the decedent was of sound and disposing mind and memory at the time,—in other words, competent to make a will,—the reading of the paper in her presence, though it was written by Mr. Rebhann from memory based upon instructions given two years before, would be satisfactory proof that she knew its provisions.   The statement to Seedorf, in decedent's presence, that she was to make her will, would be accepted as a declaration that she intended it to be such; and the further statement to Seedorf, in her presence, that she requested him (Rebhann) to sign with Seedorf as the other witness would be equivalent to a request to both to act in such relation.   But when grave doubts exist as to the testator's mental condition, the proofs must be conclusive that the declarations of the attorney in her presence were intelligently accepted by her as her own.   The opinion of Mr. Rebhann that she was of sound mind and memory is unimportant, in view of the surrounding circumstances and the facts proven by contestant's witnesses.

The testimony of the other subscribing witness, Seedorf, does not help me in solving the question.   Two or three days before, Mrs. Schaeper informed him that he would be wanted as a witness to sign the decedent's will.   On the day of the execution a girl came to his store, underneath the apartments of the decedent, of which she was the owner, and told him to bring up pen and ink, stating that a man upstairs wanted to see him.   He found the decedent sitting on the sofa, with Mr. Rebhann present.   He states that Mr. Rebhann read from the paper (presumably the attestation clause) that "it was going to be her last will and testament;" that Rebhann asked the decedent "whether it was her last will and testament that she had made," and she said, "Yes;" that the paper was put on the table, and she signed it with a cross; that Mr. Rebhann wanted him to sign it as a witness, and he then signed it. The testimony of the witness is unsatisfactory.   In answer to a leading question put to him, if Mr. Rebhann had asked the decedent if she wanted them to sign as witnesses, he answered that she did not in reply "say anything in particular."   It is apparent that the only request for Seedorf to sign was from Mr. Rebhann, and he does not testify to any request for Rebhann to act as a witness.   He does say that her talk was confined to saying, "Yes," but after Mr. Rebhann left he asked her how she felt, and she said she had a bad cough. Seedorf is 30 years of age, had been in America for twelve years, and for five years had been in the grocery business.   The record shows that he spoke fair English for a German, but on his examination he was hesitating in his statements, though the questions propounded were simple, and to nearly a dozen he made no reply.   Many of them were leading, and, being objected to, were very properly ruled out; and though by them his attention had been directed to the subject, and when questions were properly framed by the assistant to aid the witness' memory in recalling facts showing the due execution of the will, they failed in their purpose.   I cannot account for his halting manner in testifying on the ground of his stupidity.   I do not regard as trustworthy his statement that Mr. Rebhann asked the decedent if the paper was her will, especially as Mr. Rebhann did not testify to the fact.   It is more rational to conclude that his hesitation was caused by a doubt that the decedent at the time was in a condition to understand the nature of the business that was being done.   The testimony of the contestant's witnesses confirms me in this view.

Dr. Hurley, the attending physician, testified, without objection by any party, that he saw the decedent at some time between 4 and 5 o'clock on that afternoon.   As Mr. Rebhann states that he was at the house about half an

hour, from about 4 o'clock, Dr. Hurley's visit must have been after half past 4. He states that the decedent was sitting on the sofa, and did not recognize him; that her attention had to be called to him by saying: "This is the doctor; don't you recognize the doctor?" He says that she did not speak to anybody unless aroused, and then "simply mumbled something,—'Yes,'—and was too feeble; was a feeble-spoken woman;" and he is of the opinion that she could not understand the will unless she was aroused, and that she did not display any interest in anything around her. That it was because she was physically weak that Mr. Rebhann made her mark to the will is apparent, if the signature to the will of 1884 is genuine, for that is written in a firm, neat, and legible hand.

Mrs. Maynard, who was a tenant in the house at the time, states that at 5 o'clock on the afternoon of the 13th she was sent for and came into the room, and saw decedent sitting on the sofa in a dazed, stupefied condition, and apparently asleep or unconscious, and taking no interest in anything that was happening. She remained with her until 12 o'clock that night, and during that time decedent never asked for anything, but was wandering in her mind, and stated that she wanted to go home, and said, "I must be off to supper; it is getting late," or "dark;" and that this continued until she gave decedent medicine, after which she was apparently asleep. At 10 o'clock her husband, Mr. Maynard, carried the decedent to her bed. The next day she attended decedent, and found her worse, and she again began talking about going home, and did not recognize anybody. The same condition existed on Friday, a part of which day she was lying on the sofa, but they put her to bed in the afternoon. Mr. Maynard testifies that he saw the decedent about 9 or 10 o'clock on the evening of the 13th, and that she did not recognize anybody, and was apparently asleep, and that he carried her to her bed, and that he was with her all of Friday night and Saturday night, and that she was in the same condition. On the 17th, four days after the will was signed, she died.

The statute requires that, before a will shall be admitted to probate, the court must be satisfied of the validity of its execution. The paper under consideration was written by Mr. Rebhann two days before it was signed, from a recollection of instructions given two years previously, except that the name of a newly-born grandchild, which was to be provided for by the will of 1887, was written in the cover of the will of 1884. On the 13th of February he called on the decedent, and "talked with her about the will." What his talk was or what her responses were previous to the execution he does not state to aid the court in forming an opinion of her mental condition, which a half hour afterwards, according to the testimony of her attending physician, and an hour afterwards, from facts stated by Mrs. Maynard, was one of absolute incompetency, and so continued until her death, four days subsequently. Mr. Rebhann does not seem to have followed the usual form of asking the decedent if she declared the paper to be her will, and if she desired himself and Seedorf to sign it as witnesses. Knowing that the instrument conformed to the decedent's wishes, as expressed two years previously, it is possible that Mr. Rebhann honestly accepted her passive utterances as evidence of an intelligent comprehension of his explanations when he read the instrument to her, his statement of its character, and the purposes for which he and Seedorf were there, and that she acquiesced in such statement with a knowledge of its import. That she could have understood what he stated, and almost immediately after her departure have fallen into an unconscious condition, in which she continued until her death, is improbable. It is a singular fact that the decedent should have executed the will of 1884 with Mr. Demorest, the clerk of the proponent's attorneys, as the subscribing witness, in the absence of Mr. Rebhann, and refused to execute the will Mr. Rebhann had prepared from her instructions in 1887, and had presented to her under the same circumstances. By the will of 1884 the minor, for whom the decedent on the undisputed proofs

had a great affection, was given a legacy of $300, and the will of 1887, which excluded him from any benefaction, she refused to sign. It may well be that the refusal was because she was not satisfied with the change she had made. She certainly exhibited no anxiety to call on Mr. Rebhann and have it executed. There is nothing to show by her positive declarations her testamentary intentions, when she sent her daughter, Mrs. Schaeper, on the 9th of February, to Mr. Rebhann, with a request that he call and see her about her will. The law on the subject will be found in *Estate of Lissauer*, 5 N. Y. Supp. 260. The paper propounded as the last will and testament of this decedent cannot be admitted to probate.